### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

IN THE MATTER OF THE

Search of one (1) dark colored Apple
iPhone in Black Case; and one (1)
black Apple iPhone in clear case
with hearts located at 2 Union Square,
Charleston, WV

Case No.: 2:24-mj-00126

### AFFIDAVIT IN SUPPORT OF AN APPLICATION
### UNDER RULE 41 FOR A WARRANT TO
### SEARCH AND SEIZE

I, Special Agent Matthew Yount ("SA YOUNT"), after being first duly sworn, do

hereby depose and state as follows:

### INTRODUCTION

1.  I am an "investigative or law enforcement officer of the United States" within the

meaning of Title 18, United States Code Section 2510(7). Specifically, I am a Special Agent

with the Drug Enforcement Administration ("DEA"), assigned to the Louisville Division,

Charleston, WV District Office. In that capacity, I investigate violations of the Controlled

Substances Act (Title 21, United States Code, Section 801, *et seq.*), and related violations

of federal law including violations of 18 U.S.C. § 1956 (money laundering). I have been

employed as a Special Agent with the DEA since June 2018. Prior to becoming a special

agent, I served with the Missouri City Texas Police Department as a police officer and

narcotics investigator for approximately thirteen (13) years.

1

2. I have completed the DEA Basic Agent Training Course as well as multiple other training courses related to conducting narcotics trafficking investigations. While employed as a Special Agent, I have conducted and participated in numerous narcotics investigations at both the state and federal level. I have participated in all aspects of these investigations, including conducting surveillance, undercover operations, executing search warrants and arrest warrants, analyzing information obtained from court-ordered Title III intercept data, pen registers, trap and trace intercepts, and analyzing telephone toll information obtained through subpoenas issued by the DEA. I have been the affiant or numerous affidavits in support of both search warrants and arrest warrants. As a result of these experiences, I have become familiar with the methods of operation used by drug traffickers and drug trafficking organizations.

3. I have debriefed, or participated in the debriefing of defendants, witnesses, and informants who had personal knowledge regarding controlled substance violations. I have discussed with these subjects their methods of drug smuggling, distribution, packaging, laundering of proceeds, and other trafficking methods used to evade detection by law enforcement. I have also discussed and learned from other law enforcement investigators in regard to these matters.

4. Based on my training and experience and conversations with other experienced narcotics investigators, I have gained knowledge of the various techniques and methods utilized by drug traffickers to distribute controlled substances. I have knowledge of how

drug traffickers use cellular telephones and other electronic communication devices to facilitate and conceal their drug trafficking activities, as well as the methods employed to launder the proceeds obtained as a result of those activities.

5. For the reasons stated below, there is probable cause to believe that evidence relating to violations of federal law will be found in the stored electronic information and communications in the cellular telephones (hereinafter referred to as "devices") described more fully in Attachment A.

6. The information set forth below is either known to me personally or was related to me by other law enforcement personnel. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

## IDENTIFICATION OF DEVICES TO BE EXAMINED

7. The devices are: One (1) dark-colored Apple iPhone in a black case; and one (1) black Apple iPhone in a clear case with heart-shaped designs. Both devices are currently in the lawful possession of the DEA. The devices came into the DEA's possession after they were seized following a traffic stop conducted by the West Virginia State Police ("WVSP") on June 18, 2024. Adrian Carter ("CARTER") and Sonia Price ("PRICE") were the sole occupants of the vehicle. The WVSP transferred custody of the devices to DEA on June 18, 2024, as SA YOUNT believes there is probable cause that evidence relating to

3

violations of federal law exists on the devices. The devices were seized in order to seek this Search Warrant.

8. The devices are currently stored at DEA Louisville Division, Charleston, WV District Office, located at 2 Union Square, Suite 300, Charleston, WV 25302, in the non-drug evidence storage room. In my training and experience, I know that the devices have been stored in a manner in which the devices' contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into the possession of the WVSP and, subsequently, the DEA.

## PROBABLE CAUSE

9. On June 17, 2024, special agents assigned to the Seattle Field Division, Bellingham Washington Resident Office ("Bellingham agents") contacted your affiant, SA YOUNT, of the Charleston, West Virginia District Office requesting assistance in regards to interdicting drug proceeds in furtherance of a money laundering contract. The Bellingham agents advised that an unidentified subject ("TARGET") located in the greater Charleston, West Virginia area was attempting to transfer one-hundred thousand ($100,000.00) dollars by way of money courier to a target of their investigation. The person who was a target of the Bellingham agents' investigation is allegedly responsible for distributing ton-quantities of cocaine and methamphetamine from Culiacan, Mexico.

10. Bellingham agents advised SA YOUNT that they had cultivated a confidential source who informed them of a one-hundred thousand dollars ($100,000.00) money

4

contract that was to be picked up in the Charleston, West Virginia area[1] and laundered to their target based in Culiacan, Mexico. Bellingham agents advised that the TARGET was to be contacted by an anonymous money courier to arrange for a location where the two could meet in person and the money courier would pick up the currency from the TARGET.

11. Bellingham agents further advised that the money contract originally became known on June 13, 2024. However, due to the agents' mistaken belief that the money was going to be exchanged in Virginia, they secured an undercover agent ("UA1") through the DEA Richmond District Office who had already established contact with the TARGET for purposes of fulfilling the money laundering contract. SA YOUNT contacted UA1 who advised that the TARGET had told UA1 to come to TARGET'S barbershop in Poca, West Virginia. UA1 advised the TARGET that they would travel to West Virginia from Virginia and contact the TARGET from a new phone number. After UA1 and the TARGET agreed to this course of action, DEA agents in Charleston, West Virginia took over the undercover investigation, and inserted an entirely new undercover agent ("UA2") for the purpose of fulfilling the contract.

12. Bellingham agents then provided SA YOUNT with the TARGET's cell phone number, as well as a digital photograph of a dollar bill that was used as a "token" when

---

[1] Bellingham agents advised that the money involved in the money laundering contract was initially supposed to be picked up in Virginia.

contacting TARGET. The token bore a serial number of J01577178A, which UA2 needed to provide to TARGET to verify that UA2 was the trusted money courier.

13. On June 17, 2024, UA2 established contact with TARGET to arrange a meeting the following day. The text message from UA2 to TARGET read: "Just got into town, I'll hit you up tomorrow afternoon for a spot." Affiant has reviewed screen shots of this text exchange between UA2 and TARGET.

14. At approximately 12:22 p.m., on June 18, 2024, TARGET called UA2, and began the conversation by reciting the token serial number of J01577178A. UA2 confirmed that the token serial number was correct, and TARGET advised he was able to meet. TARGET asked UA2 to travel to TARGET's shop to make the exchange. UA2 told TARGET that UA2 did not want to meet at TARGET'S shop and preferred a large parking lot. UA2 suggested meeting at the parking lot at Lowe's Hardware Store located at 1000 Nitro Blvd., Nitro, West Virginia. TARGET explained that previous money pickups occurred at his shop without issue, and that TARGET was reluctant to drive with the money in his vehicle. TARGET advised that he would call back with a different location. UA2 advised affiant of the substance of the conversation immediately after the phone call ended.

15. At approximately 1:41 p.m. on June 18, 2024, TARGET sent a text message to UA2 which read: "Ima come to cross lanes bro." UA2 responded with "Sounds good." Affiant has reviewed screen shots of this text exchange.

16. In preparation for the scheduled meeting, agents with the DEA Charleston District Office and the WVSP K-9 Unit ("TROOPERS") established surveillance in the area of the Lowe's parking lot at 1000 Nitro Blvd., Nitro, West Virginia.

17. At approximately 2:30 p.m., on June 18, 2024, UA2 sent a text message to TARGET stating: "Heading to Lowe's."  Affiant has reviewed a screen shot of this text message sent from TARGET.

18. At approximately 2:39 p.m., on June 18, 2024, TARGET sent a text message to UA2 that read: "Be there in a few in a white Durango."  UA2 responded by indicating they would be driving a "Silver Bronco."  Affiant has reviewed screen shots of this text exchange been UA2 and TARGET.

19. At approximately 2:47 p.m., on June 18, 2024, TARGET sent a text message to UA2 that read: "At Lowe's right."  UA2 responded with: "Yeah I'm going between Lowe's and Staples."  TARGET responded: "Ok bet."  Affiant has reviewed screen shots of this text exchange between UA2 and TARGET.

20. At approximately 2:59 p.m., UA2 observed a white Dodge Durango SUV bearing West Virginia registration N3R783 ("TARGET vehicle") traveling toward the Lowe's parking lot.  UA2 advised affiant when the TARGET vehicle was observed.

21. At approximately 3:05 p.m., UA2 sent a text message to TARGET which read: "About to pull in.  You here?"  The TARGET responded via text stating "Yeah here," and "By dollar tree."  At that time surveillance agents observed the TARGET vehicle park in

the Dollar Tree parking lot beside the Lowe's.  After the TARGET vehicle parked, surveillance units observed an unknown black female wearing a red cap exit the passenger side of the TARGET vehicle and enter the Dollar Tree store.  Affiant has reviewed screen shots of this text exchange between UA2 and TARGET.

22. Investigators planned to contact TARGET and move the meeting location to a different location.  This plan was made prior to the operation as a means to identify TARGET and TARGET vehicle, and then effect a traffic stop as TARGET drove to the new location.  Accordingly, UA2 called TARGET and advised that they needed to meet at another location due to law enforcement presence.  TARGET stated that it was his uncle in the TARGET vehicle.  TARGET advised that he would direct his uncle to meet UA2 at a TGI Fridays nearby.  UA2 advised affiant of the substance of this conversation with TARGET.

23. At approximately 3:11 p.m., on June 18, 2024, after UA2 contacted TARGET, surveillance units observed the unknown female exit the store and get back into the TARGET vehicle.

24. At approximately 3:13 p.m., on June 18, 2024, TARGET sent UA2 a text message stating: "he coming to Fridays now bro," to which UA2 responded with "Bet," and "2 min out."  Affiant has reviewed screen shots of this text exchange between UA2 and TARGET.

8

25. At approximately 3:16 p.m., on June 18, 2024, TROOPERS conducted a traffic stop on the TARGET vehicle in a Sheetz parking lot located at 104 Lakeview Drive, Charleston, West Virginia. Surveillance personnel observed as TROOPERS made contact with the occupants. The registered owner of the TARGET vehicle came back to Tarrell Emmaud Spencer, who was not present. The driver and uncle of the TARGET vehicle was identified as CARTER.[2] The female passenger was identified as PRICE.

26. Your affiant observed as TROOPERS ran their K-9 partner around the outside of the TARGET vehicle. TROOPERS later informed the surveillance units that they had conducted a search of the vehicle and located a shoe box with a large sum of U.S. currency in the trunk compartment. Your affiant traveled to the scene of the traffic stop to take custody of the currency. TROOPERS advised that they observed the smell of marijuana emanating from the TARGET vehicle upon their approach. The K-9 alerted to the presence of controlled substances as well. TROOPERS also noted that CARTER denied knowledge of the currency, but was insistent on having it counted before being seized. TROOPERS seized the cash located inside the TARGET vehicle, as well as two cellular phones possessed by CARTER and PRICE.

27. TROOPERS relinquished two (2) cellular devices taken from CARTER and PRICE. The first phone was identified as an Apple brand iPhone with a black case. The second

---

[2] Because TARGET remains unidentified at this time, Affiant is unable to confirm whether CARTER is TARGET's uncle as TARGET claimed.

iPhone was identified as an Apple brand iPhone with a clear case depicting heart-shaped images. TROOPERS released CARTER and PRICE on scene without incident. The seized currency was later taken for an official count before being relinquished to the U.S. Marshals Service. The total amount was ninety-nine thousand, nine-hundred eighty dollars ($99,980.00).

28. Affiant's knowledge of cellular telephones and their use in criminal activity is based upon my training and experience that when individuals use "smart phones", such as these devices recovered from CARTER and PRICE, in the course of drug trafficking, evidence of their activities remains on the memory of the phone. Such evidence includes messages, contact lists, call logs, photographs of drugs, money, and co-conspirators, information relative to the ownership, registration, and usage of the device, location information in the form of address searches and mapping information relative to travel in furtherance of the enterprise as well as email communication with suppliers and customers, calendar information, ledgers, and notes.

29. I also know that people who traffic controlled substances frequently take or cause to be taken photographs or other images of themselves in possession of the controlled substances, their associates, their property, their drug proceeds and other assets with cell phones. They also frequently utilize cell phones as a way to communicate with other individuals in order to traffic controlled substances.

30. Searching the cellular telephones for the evidence described above may require a range of data analysis techniques. In some cases, it is possible for agents to conduct carefully targeted searches that can discern evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. Criminals can mislabel or hide directories and other electronic data to avoid detection or take other steps to frustrate law enforcement searches for incriminating data. These steps may require agents to conduct more extensive searches, such as scanning areas of the device's memory not allocated to listed files or opening every file and scanning its contents briefly to determine if it falls within the scope of the warrant. Considering these difficulties, I request permission to use whatever data analysis techniques appear to be necessary to locate and retrieve the evidence described above. While the cellular telephones are capable of accessing the internet and service providers maintaining servers or similar electronic storage facilities, this warrant seeks authority solely to examine the memory of the cellular telephones themselves. At no time will techniques be utilized to access data stored at any location other than within the memory of the cellular telephone.

## CUSTODY OF THE DEVICES

31. The devices seized from CARTER and PRICE are currently in the custody of the DEA, and are secured in the non-drug evidence storage room at the DEA Louisville

Division, Charleston, West Virginia District Office, located at 2 Union Square, Suite 300, Charleston, WV 25302.

32. Affiant asserts that, to the best of his knowledge, that the devices are stored in a manner such that the devices themselves, and their contents are in substantially the same state as they were when the devices first came into the possession of the WVSP and, subsequently, the DEA.

## CONCLUSION

33. Based upon my knowledge, training, and experience, I believe there is probable cause to believe that evidence of crimes, including violations of 18 U.S.C. § 1956(a) will be found in the stored electronic information and communications within the devices.

34. SA YOUNT, having signed this affidavit under oath as to all assertions and allegations contained herein, states that its contents are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

Matthew S. Yount
Special Agent, DEA

Sworn to by the affiant telephonically in accordance with the procedures of Rule 4.1 on July 11, 2024:

DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE

12